No. 96,299

STATE OF KANSAS, *Appellee*, v. MARCUS TYLER, Jr., *Appellant.*
(191 P.3d 306)

Opinion filed September 5, 2008.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause and was on the brief for the appellant.

*John J. Bryant*, assistant district attorney, argued the cause, and *Sean Baker*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Paul J. Morrison*, attorney general, were on the brief for the appellee.

The opinion of the court was delivered by

JOHNSON, J.: Marcus Tyler, Jr., appeals his convictions for first-degree murder and conspiracy to commit first-degree murder. Tyler asserts judicial misconduct, questions the sufficiency of the evidence, and challenges the constitutionality of the adult certification procedure under K.S.A. 38-1636 (repealed January 1, 2007). We affirm.

## FACTUAL OVERVIEW

Tyler made two voluntary statements detailing the events surrounding the shooting death of Michelle Wallace, which occurred when Tyler was 17 years old. On Thanksgiving Day, Tyler was visited by Mark McGee and Aaron Roundtree. During the visit, Roundtree said that he needed about $200 for car repairs, prompting McGee to say that he would give Roundtree the money if he killed a woman. McGee also asked Tyler to do the murder, but Tyler refused, saying he could not do it because he loved his family.

After Roundtree agreed to commit the murder, McGee called Wallace and arranged to meet her at a Quik Trip convenience store. McGee told Tyler that if Tyler would "roll with them" and not tell anyone, McGee would give Tyler drugs.

The victim was waiting in an SUV in the Quik Trip parking lot. McGee instructed Tyler to ride in Wallace's vehicle and to make sure no one was following her. The victim drove her SUV, following Roundtree's vehicle. At some point, McGee and Roundtree left their vehicle and got into the victim's SUV. Wallace drove, Tyler sat in the front passenger seat, McGee sat behind Tyler, and Roundtree sat in the backseat behind Wallace.

McGee gave Wallace directions where to drive, and when the vehicle arrived at an unlighted area, Tyler thought "they" were going to shoot Wallace. However, McGee directed Wallace to drive further, later explaining that the area was not dark enough. Ultimately, Wallace was directed to stop at another location, where Roundtree drew a gun and shot Wallace in the head. Tyler jumped

out of the SUV and heard more gunshots. McGee grabbed Wallace's purse from the center console and took her money. The group ran away from the scene. Wallace died of multiple gunshot wounds.

Tyler also told the police that when McGee asked Tyler to come with them, Tyler tried to say "no," but Tyler did not want to turn them down, so Tyler said "yes." In response to the detective's question as to the purpose of McGee wanting Tyler to go with him, Tyler responded, "So I could watch out [to] see if her baby daddy was following us."

## PROCEDURAL HISTORY

On May 18, 2004, the district court certified Tyler for adult prosecution, finding that Tyler had failed to rebut the K.S.A. 38-1636(a)(2) presumption that he should be treated as an adult based on his age and the severity of the charged crime. Tyler was then charged with one count of acting as an aider and abettor for murder in the first degree, one count of conspiracy to commit first-degree murder, and one count of theft.

At his first jury trial, the district court gave a modified instruction on aiding and abetting, despite the State's objection. Tyler was acquitted of the theft charge, but the jury was hung on the murder charges.

At a second trial on the murder charges, the defendant, McGee, and Roundtree did not testify. However, the jury was shown videotape recordings of Tyler's two statements to law enforcement. During the instructions conference, the State objected to the non-PIK language addition to the aiding and abetting instruction, claiming that after it was used at the first trial, two jurors had reported that they were confused by the instruction. The district court took the matter under advisement.

The following morning, the district court announced that it had read the Kansas cases and considered the State's argument. The judge also said that he "ran that language by a couple of lay people not connected with the case" to see what they believed the disputed sentence meant. The district court ruled that it would delete the disputed sentence from the instruction because even though

the judge believed the sentence was straightforward, others did not.

The jury found Tyler guilty on both counts. He was sentenced to life (hard 25) for the first-degree murder conviction and 117 months' imprisonment for the conspiracy to commit murder conviction. He timely appeals, and we have jurisdiction pursuant to K.S.A. 22-3601(b)(1).

## JUDICIAL MISCONDUCT

First, Tyler contends that the trial judge violated Supreme Court Rule 601, Canon 3B(7) (2007 Kan. Ct. R. Annot. 624), by consulting with lay persons about the clarity of the proposed instruction on aiding and abetting and that the judicial misconduct mandates a reversal for a new trial. The Canon provides, in relevant part:

"A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding . . . ." 2007 Kan. Ct. R. Annot. 625.

The commentary to Canon 3B(6)-(7) explains that "[t]he proscription against communications concerning a proceeding includes communications from lawyers, law teachers, and other persons who are not participants in the proceeding, except to the limited extent permitted." 2007 Kan. Ct. R. Annot. 625. The exceptions to Canon 3B(7) include ex parte communications for scheduling, administrative purposes, or emergencies that do not deal with substantive matters or issues on the merits. Canon 3B(7)(a).

Tyler did not raise the issue below. Citing *State v. Puckett*, 230 Kan. 596, 598-99, 640 P.2d 1198 (1982), he contends that we should employ an exception to the general rule which precludes review of issues first raised on appeal. More specifically, we can review an allegation of judicial misconduct on appeal despite the absence of a contemporaneous objection where the defendant claims his or her right to a fair trial was violated. *State v. Brown*, 280 Kan. 65, 70, 118 P.3d 1273 (2005).

Our review of a judicial misconduct allegation is unlimited and must be based upon the facts and circumstances of each case. *State v. Gaither*, 283 Kan. 671, 681-82, 156 P.3d 602 (2007). If it affirmatively appears that the conduct prejudiced the substantial rights of the complaining party, the judicial misconduct warrants a new trial. The party asserting judicial misconduct bears the burden of showing his or her substantial rights were prejudiced. *Gaither*, 283 Kan. at 682; *State v. Hayden*, 281 Kan. 112, 116, 130 P.3d 24 (2006).

The same judge presided at both trials. At the first trial, the court gave the following aiding and abetting instruction:

"A person who, either before or during its commission, intentionally aids and abets another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime.

"All participants in a crime are equally guilty without regard to the extent of their participation. However, mere association with principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abettor. *To be guilty of aiding and abetting in the commission of a crime the defendant must willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would in something he wishes to bring about or to make succeed.*" (Emphasis added.)

At the second trial, the judge refused Tyler's request to again include the last sentence, italicized above, explaining:

"When we were last on the record, I told counsel that I would review the Kansas cases from which that sentence was taken and reconsider or consider the State's argument on that issue. I've done that, I've reread the cases. Basically, the language I think where it first shows up is I think *State vs. Schriner* or *Shryer*, something of that nature. It's a 215 Kan. case.

"The author of the opinion of that case I'm pretty sure was Chief Justice Schroeder who indicated that [it] was an accurate statement of Kansas law. However, in that case that instruction was objected to by the defendant in the case. And the opinion does indicate or does state in addition to being an accurate statement of Kansas law, it also indicates that it raises a higher evidentiary burden. I frankly don't see that. However, that is the language there.

"I would tell counsel as well I ran that language by a couple of lay people not connected with the case to see what they thought it meant last night, and while it seemed straightforward to me, and maybe it's because I've been a lawyer for 30 plus years now, it seemed straightforward to me; to some other folks it didn't.

"And so it's the Court's intention to delete that very last sentence which reads, quote, 'To be guilty of aiding and abetting in the commission of a crime, the defendant must willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would in something he wishes to bring about or make succeed,' end of quote."

The State makes a half-hearted, unpersuasive attempt to justify the district court's ex parte communications as appropriate to obtain a lay opinion on the clarity of jury instructions. We disagree. Perhaps the PIK Committee could benefit from controlled focus group studies on the clarity and comprehensibility of jury instructions. However, it was inappropriate for the district court to conduct an impromptu, ex parte experiment for use in making a substantive ruling in an ongoing prosecution. However, the inquiry does not end here.

Tyler appears to acknowledge that a reversal requires something more than simply establishing judicial impropriety. However, he argues, without support, that the touchstone of the further analysis is whether the district judge would have granted his request to add language to the PIK instruction, if the ex parte communication had not occurred. He then argues why the record supports his contention that the judge's decision was persuaded by the outside lay opinions.

Although he cites to *Carpenter v. State*, 223 Kan. 523, 575 P.2d 26 (1978), and *State v. Scales*, 261 Kan. 734, 933 P.2d 737 (1997), Tyler concedes their factual differences, and neither case furthers his cause. Indeed, *Carpenter* refused to condone the trial judge's ex parte communication with the Disciplinary Administrator, but also refused to reverse because the defendant was not prejudiced. 223 Kan. at 527. *Scales* did find that a judge's ex parte communications prior to sentencing required reversal for resentencing, but based its result on a finding that the judicial misconduct had directly impinged upon the defendant's due process right to a fair sentencing hearing. 261 Kan. at 742-43. Neither case supports the contention that we must consider what decision the court would have made without the improper communications.

The purpose of jury instructions is to guide the jurors in their deliberations and aid them in arriving at a legally proper verdict.

*State v. Cathey*, 241 Kan. 715, 730, 741 P.2d 738 (1987), *disapproved in part on other grounds State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006). Because Tyler objected to the district court's deletion of the proposed sentence from the aiding and abetting instruction, we consider the instructions as a whole. Instructions are not reversible error if they properly and fairly state the law as applied to the facts of the case and could not have reasonably misled the jury. *State v. Edgar*, 281 Kan. 47, 54, 127 P.3d 1016 (2006).

Here, the first paragraph of the aiding and abetting instruction is from PIK Crim. 3d 54.05. The second paragraph is compiled from citations mentioned in the comments to 54.05, *State v. Turner*, 193 Kan. 189, 196, 392 P.2d 863 (1964) (All participants in a crime are equally guilty, without regard to the extent of their participation.); *State v. Jackson*, 201 Kan. 795, 799, 443 P.2d 279, *cert. denied* 394 U.S. 908 (1968), *overruled on other grounds State v. Mims*, 220 Kan. 726, 730, 556 P.2d 387 (1976) (same); and *State v. Green*, 237 Kan. 146, Syl. ¶ 4, 697 P.2d 1305 (1985) (Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider and abettor.). In other words, the aiding and abetting instruction which was given to this jury was a compilation of those which have been recommended by the pattern instructions and the authority cited in its comments.

Pointedly, Tyler conceded at oral argument that the district court gave a jury instruction on aiding and abetting which was an accurate statement of the law. He does not argue that the peculiar facts of this case mandated the inclusion of the additional language he requested. *Cf. State v. Mitchell*, 269 Kan. 349, Syl. ¶ 4, 7 P.3d 1135 (2000) (if particular facts in given case require modification of applicable pattern instruction, trial court should not hesitate to make such modification). Without the claim of judicial misconduct, Tyler would have had no basis to complain about the instruction which was actually given. Because Tyler had no substantive right to have the additional language included in the instruction, we cannot find that the challenged judicial conduct affirmatively and

directly prejudiced a substantial right of the complaining party, so as to warrant a new trial. See *Gaither*, 283 Kan. at 682.

## SUFFICIENCY OF THE EVIDENCE

Tyler contends that the State's proof that Tyler aided and abetted in Wallace's murder was fatally deficient. Tyler does not dispute his own statements which admitted that he accompanied McGee and Roundtree on their murderous venture in return for a promise that he would receive drugs; that he agreed to be a lookout in the victim's vehicle to assure that it was not being followed by her boyfriend; that he entered into the victim's vehicle and, from outward appearances, maintained a position from which he could act as a lookout; and that he remained with the group until the murder was completed, despite a change of vehicles and one or more intervening stops. However, he makes the creative argument that the State failed to prove that he actually looked for the boyfriend while riding in the victim's car.

Under our familiar review standard, we must consider all of the evidence, viewed in a light most favorable to the prosecution, and determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Parker*, 282 Kan. 584, 597, 147 P.3d 115 (2006). Specifically, with respect to the question of aiding and abetting, the court has said:

"It is well established in Kansas law that the mere presence of an accused at the time and place of the crime alleged is not sufficient to make the accused guilty of the crime, but if from the facts and circumstances surrounding the defendant's presence at the time and from the defendant's conduct it appears that the defendant's presence did in fact encourage someone else to commit the criminal act, guilt may be inferred. *State v. Smolin*, 221 Kan. 149, 153, 557 P.2d 1241 (1976). In the absence of anything in a person's conduct showing a design to encourage, incite, aid, abet, or assist in the crime, the trier of the facts may consider failure of such person to oppose the commission of the crime in connection with other circumstances and conclude therefrom that the person assented to the commission of the crime, lent his or her countenance and approval thereto, and thereby aided and abetted the commission of the crime. 221 Kan. at 153." *State v. Wakefield*, 267 Kan. 116, 121, 977 P.2d 941 (1999).

Accord *State v. Bradford*, 272 Kan. 523, 528, 34 P.3d 434 (2001).

However, Tyler relies on *State v. Schriner*, 215 Kan. 86, 92, 523 P.2d 703 (1974), where we held that in order to be found guilty of aiding and abetting, "a defendant must wilfully and knowingly associate himself with the unlawful venture and wilfully participate in it as he would in something he wishes to bring about or to make succeed." Tyler argues that the State only proved that Tyler *agreed* to act as a lookout, *i.e.*, that he associated himself with the unlawful venture, but that the State did not prove that Tyler actually *performed* the role of a lookout, *i.e.*, that he participated in the murder as if he wished it to succeed.

The apparent suggestion is that the State had to submit direct proof that Tyler actually looked out the windows of the victim's car in search of the victim's boyfriend. Tyler would have us require too much. A conviction of even the gravest offense may be sustained by circumstantial evidence. Circumstantial evidence is evidence of events or circumstances from which a reasonable factfinder may infer the existence of a material fact in issue. *State v. Lopez*, 36 Kan. App. 2d 723, 725, 143 P.3d 695 (2006).

A reasonable jury could infer that, when Tyler agreed, in return for drugs, to "roll with" McGee and Roundtree on their murderous trip, Tyler understood that he would be a participant in the unlawful venture, even though he had declined to be the actual shooter. The promise of drugs could provide the incentive for Tyler to wish to bring about the success of the planned crime. A rational jury could reasonably infer that Tyler actually carried through with his promise to be a lookout, when he assumed his position in the victim's vehicle and remained in the victim's presence until the murder was completed. In other words, the evidence reasonably established more than mere presence at the time and place of the murder and was sufficient to support the jury's verdict that Tyler aided and abetted in Wallace's murder.

## APPRENDI *VIOLATION*

Next, Tyler argues that when the district court made factual findings supporting its decision to authorize adult prosecution, it increased his potential punishment in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

This raises a question of law, and our standard of review is unlimited. See *State v. Jones*, 273 Kan. 756, 770, 47 P.3d 783, *cert. denied* 537 U.S. 980 (2002).

Tyler points out that, if he had been adjudicated for the murder as a juvenile offender, his punishment could not have extended beyond his 23rd birthday, when the jurisdiction of the juvenile court terminates. See K.S.A. 38-1604(c)(2). In contrast, by prosecuting him as an adult, the State subjected him to the possibility of a hard 50 life sentence. See K.S.A. 21-4706(c). Therefore, the argument continues, the factual findings necessary to certify an adult prosecution violate the mandate that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Accordingly, Tyler asks for a reversal and a remand to submit his adult certification hearing to a jury.

Tyler acknowledges that *Jones* rejected this argument, but he urges us to reconsider that ruling, which has been affirmed in subsequent decisions. See, *e.g.*, *State v. Mays*, 277 Kan. 359, 367-68, 85 P.3d 1208 (2004); *State v. Kunellis*, 276 Kan. 461, 465, 78 P.3d 776 (2003). Tyler's argument for reconsideration focuses on his assertion that the reasoning in *Jones* was largely based on policy reasons as to why it is undesirable to allow a jury to make the certification ruling. However, *Jones* also cited to the Court of Appeals decision in *State v. Hartpence*, 30 Kan. App. 2d 486, 496, 42 P.3d 1197 (2002), which opined that the adult certification process is "a jurisdictional determination," rather than a sentencing question. *Apprendi* dealt with the imposition of a sentence beyond the statutory maximum permitted by the facts necessary to the jury's finding of guilt. That constraint would still apply after the certification procedure sends the juvenile to adult court. A State is not constitutionally required to provide preferential treatment to juveniles, and *Apprendi* was not intended to place constraints on the determination of which court will prosecute a juvenile offender. The holding in *Jones* remains valid.

*CONSTITUTIONALITY OF K.S.A. 38-1636(a)(2)*

Finally, Tyler argues that the presumption under K.S.A. 38-1636(a)(2) that he is an adult because of the severity of his alleged offense violates his due process rights. Although he acknowledges that we rejected this argument in *State v. Coleman*, 271 Kan. 733, 734-38, 26 P.3d 613 (2001), he asserts the argument here to preserve it for any subsequent federal appeal.

As in *Coleman*, Tyler relies on *In re J.L.*, 20 Kan. App. 2d 665, 891 P.2d 1125, *rev. denied* 257 Kan. 1092 (1995). That case found the presumption of parental unfitness in the termination of parental rights statutes violated the parent's procedural due process rights. 20 Kan. App. 2d at 676. The glaring fallacy in Tyler's reliance on *In re J.L.* is that a parent has a fundamental liberty interest in the custody and control of his or her children which is protected by the Fourteenth Amendment to the United States Constitution. A juvenile has no constitutional right to be adjudicated under the Juvenile Justice Code. As Tyler conceded at oral argument, a statute which provided that any person, regardless of age, will be prosecuted for murder under the adult criminal statutes would be constitutionally permissible. Obviously, then, the rebuttable presumption of adult prosecution under K.S.A. 38-1636(a)(2) is likewise not constitutionally infirm.

Affirmed.